3.13.0031. Report of the State of Illinois Appellee by Justin Nicolosi v. Sherman Williams Appellant by Carrie Bryson.  Good morning, Your Honors. May it please the Court, Counsel, I'm Carrie Bryson on behalf of the Office of the State Appellate Defender. I represent Sherman Williams in this matter. We presented two issues in the briefs, the first having to do with error in the Circuit Court's denial of the defendant's motion to suppress evidence, and the second having to do with error in the monetary assessments that were imposed in the case. The State has conceded on the second issue, and so I'm intending to limit my remarks to the first, unless Your Honors have some questions on the second. The question in this case with regard to that first issue is whether the police had valid consent to enter and search the residence in question here, which was Sherman Williams' mother's house. Now the State, this Court should note, the State initially conceded that Sherman did have authority over the residence. He had a privacy interest and had common authority. That's not an issue at this level of the proceedings. We submit that there are two bases in which the Court erred in denying the motion to suppress, and either of those bases should result in this Court reversing that denial. And the first is that Sherman Williams, as a person with common authority, was present and objecting to the police officer's search. Under Georgia v. Randolph, of course, where there are multiple people with common authority over a residence where one of them consents, that consent would still be unreasonable as to another party who is there physically present and expressly objects to the entry in the search. And that's what happened in this case. Now unfortunately in the Court's order, the Circuit Court didn't make any specific findings on this contention. And so I guess we're left to kind of reason out why the Court on this basis wouldn't have denied the motion to suppress. Either the Court was wrong as a matter of law, in which case, of course, this Court should reverse and remand the case. Or the Court factually found that there was no objection, and in which case the Court was, that was manifest error on the evidence that was presented here. Both Sherman Williams and his brother Jeffrey testified that Sherman did not, that Sherman did object. He did not give consent. He objected to the entry by the police. The police officer, he testified he didn't recall having any conversation with Sherman, which seems unreasonable given that both defendants were present at the door, but that was his testimony. Did Hopwood say both were at the door? Well, he said Jeffrey was there first, and Sherman came up behind. So they were, but I mean, there is an acknowledgment both were there. Interestingly, and kind of an unusual circumstance in this case, is that the victim of the residential burglary was present at the time of this search. She had actually retrieved the police. Wasn't she a neighbor? She was. She was a neighbor and a co-worker of the homeowner. So she has a lot of familiarity with who lives at the house, who's there, you know, who comes and goes and what not. She knew both the homeowner and knew who the defendant in this case and his brothers, who were co-defendants, were. They were not tried together. They were charged together. They were not tried together. And I only represent this particular defendant. So this neighbor, the victim, Miss Bonner, she says, you know, they went to the door and the police officer asked, where's the homeowner? Which, if he thought, you know, that they could let him in or, you know, wasn't concerned about that, probably wouldn't have asked. So he knew from her, presumably, from Bonner, that the homeowner wasn't present, Shelley Williams. And he made a call to someone. He says he doesn't recall if he made a call beforehand, before the search, or if he made a call after. Shelley Williams testifies she got a call before or at a time that would have coincided with being before. And the brothers testify he called before. So while that doesn't go directly to the question of Sherman Williams saying he objected, she backs up their version. Bonner's testimony is more in line with what Sherman Williams and his brother are saying than with what the police are saying. Which I find interesting, given that she would have no reason to back up what the defendant and his brother are saying. Let's talk about that. Yeah, sure. She's the neighbor, right? She is. So she lives right here across from these people. She got her stuff back, right? She lives across the alley. Presumably, yeah, she got her stuff back. They found her stuff. So now the question is whether her neighbor's kids are going to prison. And she's got to live there. So I'm not sure it's as clear to think that she didn't have a motive to back off and support them. So got my stuff back. And I'm not going to hold up my neighbor's kids in prison, because I got to live here. That's a legitimate question. A couple of things on that point. First of all, we don't really know what the court thought about that, because the court didn't make a finding on this matter. And so to the extent factual findings from the court are necessary, from the circuit court, we'd ask you to send it back. So the court can make a determination if we're talking credibility. But the other thing is, if Bonner's going to pull back from her testimony about what happened, or is going to somehow back up the defendants, this is pretty minimal. I mean, she's not giving some wholehearted retraction of, you know, they took her stuff. I mean, she comes. She testifies. She still testifies in support of the state's case on the motion to suppress. I think the defense called her. But she testifies at trial. You know, she still comes in and says, you know, I got this information from some other neighbors. They told me they saw these guys take my stuff. You know, I went in. I ID'd the stuff. They had all these things. I didn't give them permission to take it. So she doesn't really back them up. If she says, gee, they didn't take my stuff, and that wasn't my stuff they found in their house, then she doesn't get it back. I guess either way, we're suggesting she's committing perjury. And I don't think there's anything on the record to support the contention that she's committing perjury. I'm pointing out there is a motive, and it's not unusual for this type of thing to occur. Witnesses all of a sudden forgetting what happened when it comes time for trial. This is earlier on, though. This is at the motion to suppress. I mean, we're not at the trial stage. Let me ask you one other point. There was an issue about whether one of the coppers told, what was the gentleman's name that opened the door on the brother? Jeffrey. And he said, well, I'm paroled here. And there was an issue of whether or not a policeman said, well, if you're paroled here, if you're on parole and you don't give me permission to search, you're going in for parole. Well, if Sherman were standing there, Sherman, who's also on parole, and heard that, might not, he'd think, gee, I'm on parole, too. The same's going to apply to me. And that would give him reason not to open, not to object, because then it's a quick, if the police want to, oh, you're not going to give me permission to search? And by the way, you've got control over this thing? Assume the position that we're going downtown and you're going back to Stateville. There's no, I mean, the officer says he told them this is after a phone call, I think, to Shelly Williams is how this develops. He makes a call and then he tells them, you know, you better let me search. This is what the brothers testify. But Sherman Williams says he was still objecting. Jeffrey Williams says, that's when I said, you know what, yep, come on in. And let me, not just come on in, let me show you through the house. Well, I think, I mean, my point is, it's disputed, right, as to who said what and when? It is disputed on this record and we don't have findings by the court, which is, I guess, really the problem. If this is coming down to a factual dispute, you know, a credibility question, we don't have findings by the court as to this particular issue on which this court can rely. But do we assume that the court knows the law and that by its own ruling on the motion to suppress implicitly made those findings? Except the court didn't address this basis in its ruling. You know, the court specifically addressed the basis of, well, Jeffrey had authority. Jeffrey consented, Jeffrey had authority, either actual or apparent. But the court did not address the question of whether Sherman Williams objected and what effect that would have. Because even if Jeffrey had authority, if he had actual authority, if he had apparent authority, if Sherman Williams is there objecting, as does Sherman Williams. We have Sherman Williams saying he's objecting. And Jeffrey Williams saying he's objecting. And Jeffrey's saying that he's objecting, his own brother. His brother? Yeah. I mean, implicitly, is the trial court saying, I can't believe these people. I don't think implicitly that... I understand the court's concern. I do. But I think that this is an important consideration. This could be a determinative issue. And I think we need the court to say something on that. So I guess to the extent the court didn't, I would ask this court to send it back. And the state hasn't offered any objection to that as a potential remedy in this case. Do you think the proper disposition would be to send back with directions for the trial court to make explicit findings as to credibility of the two Sherman brothers? I think not necessarily to make explicit findings as to credibility, but to make factual findings on this particular issue. So make a factual finding on was there an objection or not, which I guess would come down to credibility. But make those factual findings that would be determinative, then, of the legal issue. And the legal issue, of course, being under Georgia v. Randolph, was he present and expressly objecting? Well, there's also the corollary that if they both have full control over the premises, if one grants it and one objects, that there is not... Right. So as to the one who grants it, the search is fine. But as to the one who objects, the search is unreasonable. Yeah. That's what Georgia v. Randolph says. Right. If a finding is made that that is credible. Right. I don't think it matters here. Okay, so let's suppose Sherman objects and says, and by the way, oh, Sherman, you're on parole, right? Yeah. All right. Sherman, you're under arrest. Officer Jones, put Sherman in a police car and deliver him to the test of the Sheriff of Peoria County. Bye, Sherman. Okay. Now, by the way, Shelley or whatever, the brother, now that Sherman's gone, can we search the place? You betcha. Then what? Okay, then I think my client probably loses. There's actually case law. I can't recall. I think it's a United States Supreme Court case where the police do remove the objecting party. I think it was a husband in a domestic battery case. And I'm sorry, I'm forgetting the case named Davis, maybe. But remove the objecting party. They have a basis to remove him. As long as it's a legal removal. Yes. But that's not what happened here. Right. And the state hasn't offered that as a – No, I understand. And I get it. And I agree with you. It's not. But it's kind of a curious question. Yeah. Georgia v. Randolph is very narrow and very specific that the person has to be physically present and objecting. Once they're removed, they're no longer physically present. And the United States Supreme Court has said that that's – that would – my client's argument would, of course, fall out. So, anyhow, on the Georgia v. Randolph issue, if this court doesn't believe that the record, I guess, is sufficient or, you know, the factual findings are necessary to ask you to send it back, obviously, it would ask you to reverse, first of all, and say that the record is sufficient. And the alternative, it can go back for that. A second alternative is whether or not Jeffrey had authority. Jeffrey being the consenting party here. Did he have actual authority? He had less authority than Sherman. But the court found he did have authority. What did they do there? What did Sherman do? So Shelley Williams' testimony is that Sherman comes over every day. He doesn't have his own job. So his job is, like, to watch her house. Comes over when? Comes over all day. Every day. Comes when she leaves for work. Every couple days? Jeffrey, every few days. Every two to three days. Sherman, every day. While she's at work, at least. So five – assuming five days a week. Comes over and watches the house. So he hangs out there in the morning, has some breakfast. Apparently, when the police came this time, they were playing some video games. He and the brothers – the brothers are the only people allowed into the house. Apparently, Shelley had had a break-in at the house before, which is why she doesn't care to leave the house open and unattended. So I see the irony. I do. But that's – so that's what he does. He walks down to the corner store. He walks over to an aunt's house, something. But he's there. Sherman. All day.  He has a key. Jeffrey a few times a week. Yeah. Jeffrey a few times a week. Sherman stays the night sometimes. Jeffrey doesn't. But didn't – didn't Jeffrey tell the police officer, I'm paroled here? Now, do you think it was unreasonable for the police officer to think that he – if I'm paroled here, that he has the authority to – So he says I'm – that he was paroled there. That's what the officer testifies. Yeah. But the officer also knows that he's not the homeowner, or in this case, I guess, the lesser, because it's not an owned home. She's the tenant. Shelley Williams is the person on the lease. Well, my two adult sons at home, and I'm – he's not the homeowner either, but he's there, and he's got a bed. So does it have to be the homeowner? Well, I think there ought to be some inquiry as to whether or not you can let me – you can't just rely on something that's ambiguous. I mean, here the officer knew he answered the door. What's ambiguous about I'm paroled here? I'm sorry? What's ambiguous about I'm paroled here? Well, he's not saying I live here, right? I mean I'm paroled here. Can you tell the parole board you're paroled – can you tell the DOC and the parole department that you're paroled to this address and live somewhere else? I think it happens all the time. Well, is it legal? I'm not sure that that makes a difference. If it's legal, I think it makes a difference on whether or not – Do you want police officers to be able to assume that everything the guy says is a lie? I don't want them to assume that, but I want them to make an inquiry. I want them to ask a few more questions. I don't think that's unreasonable, to ask a few more questions. Well, you may be right. It may not be unreasonable, but it's unreasonable to assume that a guy says I'm paroled, opens the door, I'm paroled here, and think, well, you've got – To me that answer is a little ambiguous. Do you live here? I'm paroled here. Aren't we looking at a reasonable estimate? I mean, apparent authority we are looking at, under the facts that are known at the moment, at that time, what would a reasonable person be warranted in believing? You ask a direct question, do you live here, and you get an ambiguous response. I'm paroled here. Maybe you should ask some more questions, another question. What does that mean? What does it mean you're paroled here? Do you stay here? Do you live here? We're dealing with our God that neither you nor I perhaps used, but those in a particular culture do use, and it may have more specific meaning than the ambiguity you and I may attach to it. Maybe, although there's nothing – Parole is – I mean, we're talking a verb here, right? Not a status noun, I mean, and so it's been changed into, right? Sure. A verb in this argot. Mm-hmm. Okay. And so that may have a more specific meaning than looking 30 feet above. It may, although we don't have anything on this record. I mean, the officer didn't say, to me, that signifies something significant, or I interpret that when we're using, I guess, terms of our – in my dealings, that means you live here. We don't have something on the record suggesting that. Counsel, two minutes. Thank you. So what the officer knew, though, was that he wasn't the homeowner, that the homeowner was at work. You know, again, he's got this neighbor, the victim, who not only is a neighbor but works with the homeowner, saying, call her at work. You know, there's some evidence he made a call. I find it interesting they don't have Jeffrey Williams sign a consent form, but they later get Shelley Williams to sign a consent form when she comes home. You know, if they think he has the authority to consent, I'm not sure why they would even need to call Shelley Williams, let alone get her to be the one to sign the consent form. I think all of this is indicative of it. It's at least ambiguous. And if it's ambiguous, the officer should have inquired further, rather than just relying on whoever shows up at the door to let them in and lead them through the house. On that basis, or on the basis that Sherman Williams was present and objecting, I'd ask this Court to reverse the denial of the motion. Who wants the difference between Sherman being there five days a week, let's say, and Jeffrey being there two or three days a week? There's a little more than that, than just Sherman being there five days a week. I mean, Sherman says he stays the night there sometimes. Jeffrey says he never stays the night. Sherman says he keeps clothes and other personal belongings there. Jeffrey doesn't say so much on that. Shelley says everybody keeps stuff at my house, my kids, my grandkids, I guess anybody who pops in leaves their things at Shelley Williams' house. Jeffrey doesn't pay any utilities. He doesn't have a key. He doesn't pay rent. If we're talking actual authority, Sherman has a key. Jeffrey doesn't. So on the question of actual authority, there are more significant things showing Sherman has actual authority. If we're talking apparent authority, obviously a lot of those things are unknown to the officer who comes to the door but could have been asked about. Okay? Unless you have other questions. Thank you, Your Honors. Thank you. Mr. Nicolucci. Good morning, Your Honors. May it please the Court. Mr. Bryson. The people would submit that, as Justice Holdridge pointed out, that the trial judge's denial of the motion to suppress in this case necessarily implies that the judge believed the officers as opposed to the brothers on the issue of whether or not Sherman Williams, the defendant here, refused Officer Hopwood's request for consent. Again, as Ms. Bryson's argument and Your Honors discussed right at the outset, this is more of a credibility issue. This is a he-said-she-said for all intents and purposes case. And the judge obviously was the wearer of the credibility. He heard all the testimony, both sides. There was Jeffrey and Sherman who said Sherman refused. And then the officer said Sherman basically said nothing. That's what Officers Walden and Hopwood testified. And the people submit, based on the results of the motion to suppress hearing, that clearly the judge believed the officers. And people would submit that the record shows that there is support for why the judge believed the officers and not Sherman and Jeffrey. There were several credibility issues with the Williams brothers. Number one, they both had criminal histories that were presented to impeach. Number two, the record was clear that both of these men either lied to or they lied to the officers. Jeffrey certainly said that he was paroled there, as was established in Ms. Bryson's argument. But however, they testified that they don't live there. Shelly testified that they don't live there. But they registered with the parole authorities that they do live there. So clearly they lied somewhere along the line. And number three, Jeffrey testified that he clearly lied to Officer Hopwood when he said that nobody was upstairs. But when they searched the house, eventually another brother, I believe his name was Santarius, he was upstairs. There was a lot of credibility issues here that the judge clearly considered when he made his decision. And for those reasons, the people would submit that the decision on the motion clearly shows that there is no ambiguity. We don't need to send it back to figure out if Sherman actually refused because Officer Hopwood, Officer Walden, both officers said. There was no refusal. The only thing they had was the consent from Jeffrey. That kind of leads into the next issue, whether or not it was reasonable for Officer Hopwood to believe that Jeffrey had the authority to consent. And very quickly, very clearly, the people would submit that he clearly had the apparent authority to consent to this search. He answered the door. And the testimony was that he was the only one who interacted with police for five minutes. It was about five minutes later that the defendant decided to come down. Again, as Justice Schmidt said, Jeffrey clearly said that he was paroled there. Well, what does that mean? Well, it means that he probably lived there. It has to mean that. And Officer Hopwood even testified that Jeffrey said that he lived there. Again, Jeffrey didn't say that. Shelley didn't testify that. But, again, the issue is what did Officer Hopwood know at the time that he approached this house and spoke to Jeffrey? He knew that this gentleman answered the door. People would submit that if there was somebody else with greater authority, for example, why would somebody else be allowed to answer the door and discuss with police these types of matters? If nobody else was home, sure. But, again, this gentleman, Jeffrey, said he was paroled there and that he lived there. Of course, that on its own is enough to support the trial judge's decision in this case. But if you want to just briefly touch on the argument that the defendant had more authority, which counsel made, again, whether that's true or not, people would submit it's not because, again, the question is, the ultimate question is what did Officer Hopwood know and when did he know it? He had no idea that Sherman, the defendant, had a key. People would submit that's not relevant anyway. But the deal is an apparent authority question, right? Absolutely. Okay. So you're saying that there's a five-minute or how-long colloquy that's testified to by the officer with someone who answers the door. And so the question is, is the substance of that colloquy, okay, give rise to a reasonable inference of apparent authority? Absolutely. Is that the question? Absolutely. Okay. So it's not a question of after the fact. No. Who has more or who has less. Exactly. And it's certainly not the law doesn't say anybody who answers the door can allow admission. Sure, sure. There has to be a reasonable conclusion of apparent authority under the law. Yes. Okay. So we're really talking about the testimony at that time. Absolutely. Absolutely. Everything else is interesting but irrelevant. Absolutely. Not relevant to the decision on the motion to quash and suppress based on apparent authority. You're absolutely right, Judge. And based on the foregoing, the fact that it was clear that Jeffrey presented himself as having authority. He said he was paroled there. He said he lived there. The people would submit that based on that evidence, the trial judge did not abuse his discretion in denying the motion to quash and suppress based on the apparent authority that Officer Hopwood believed Jeff had. And for that reason, the people would request that this court affirm the trial judge's findings. If there are any other questions, I'd be happy to answer them. I guess not. Thank you. Thank you, Mr. Jefferson. Ms. Bryson. I just want to clarify one point for this court in terms of whether this should go back for the circuit court to consider. Just looking back at my notes. Jeffrey and Sherman testified both that Sherman objected. What Officer Hopwood says is he doesn't even recall any conversation with the defendant, with Sherman. With Sherman. With having any conversation with Sherman. And what Officer Walden, who was the other officer who showed up to kind of back up on the situation, also testified he did not recall the defendant saying, my client saying, he objected to the entry. So that's do not recall versus it did not happen. I think there's enough ambiguity there that if this court is concerned about the Sherman-Williams objection, it should go back for the trial court to sort that out. Because on this record, that's not directly contradicting. You know, saying you don't remember something isn't saying something didn't happen. Well, no. But what it does say, if I find Sherman, I can't believe that if he said the same thing to me and everything else. Does it matter what Officer Walden said? I think it does matter. Because I think this is the key point, you know, to this particular issue. A controlling point of law, this is the key question. Did Sherman object or not? Well, you would think it would be remembered if he objected. I mean, that's important stuff. And saying, I don't recall. I'm really asking the trial judge, presumably, to what? Review the transcript of the testimony? Whatever the trial judge needs to do to make a finding on this, I would suggest. This court sent it back to the court to make a finding. I mean, this court has done that in other cases. Sent it back where factual findings are necessary to this court's resolution, and this court determines on the record it shouldn't be the one making the factual finding. I think there's enough here to justify this court sending it back for that. But on the ambiguity, is it reasonable to assume, and in fact it was the defense witnesses that testified, the police threatened the one brother with a parole violation for refusing to consent to a search. And isn't it reasonable to say that if Sherman said, I objected, they would have threatened him with the same thing? And, oh, take me to jail. Just don't kill me. I want to go back to prison as soon as possible. So don't search. But he's present when they make that threat. Sherman Williams is present, and there's no indication that he says, oh, OK, now I mean you can come on in. You know, I back off my objection. There's no evidence of that, and I don't think this court can take it that far. I don't even think the circuit court could find that on this record, because there's no evidence to suggest that he relented from his objection. By this testimony. By anybody's testimony. Nobody says that Sherman then said, oh, OK. No, I mean there's no testimony by Sherman that he consented. No. Right. OK, unless the court has questions. Thank you. Thank you both. For your argument today, we will take this matter under advisement and get back to you with a written disposition within a short day. We will now take a short recess for the panel.